IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Angela Ethridge Sturm,      )
              )    Civil Action No.  6:13-1097-MGL-KFM
        Plaintiff,    )
              )    **REPORT OF MAGISTRATE JUDGE**
    vs.          )
              )
Carolyn W. Colvin, Acting    )
Commissioner of Social Security,[1]  )
              )
        Defendant.   )
_____)

        This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

        The plaintiff, who is proceeding *pro se*, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on November 30, 2009, alleging that she became unable to work on August 30, 2009.  The applications were denied initially and on reconsideration by the Social Security Administration.  On November 23, 2010, the plaintiff

---

[1]  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff, who was represented by counsel, and Mary L. Cornelius, an impartial vocational expert, appeared on August 4, 2011, considered the case *de novo* and on August 24, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  Still represented by counsel, the plaintiff appealed the ALJ's decision.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 27, 2013.  The plaintiff, acting *pro se*, then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.
>
> (2)    The claimant has not engaged in substantial gainful activity since August 30, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: seizure or pseudo-seizure disorder, depression, and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925, and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant cannot climb ladders, ropes, or scaffolds; she cannot work around unprotected heights or dangerous machining with exposed moving parts; the claimant cannot operate automotive equipment; and the claimant must have no more than occasional direct contact with the public and cannot perform work requiring strict production quotas.

2

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on January 3, 1977, and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2 ).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

4

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff claims to be disabled based on a seizure disorder of unknown origin. She first reported symptoms of confusion and memory lapse in July 2007 to Dr. Joseph Healy, a neurologist, who did not have an explanation for her symptoms (Tr. 315-17). An MRI was normal, a tilt table test was normal, an ECG was "unremarkable," and a 24-hour EEG showed no definite evidence of seizure (Tr. 313-14, 317).

In August 2009, the plaintiff visited the emergency room reporting a bad headache; she was described as answering questions slowly but appropriately and walking

5

slowly, sometimes staggering (Tr. 280-81).  She was discharged the same day in stable condition and advised to follow up with a neurologist (Tr. 281, 289).

In October 2009, the plaintiff visited the emergency room, reporting that she had recently felt a "funny sensation" in her head while sitting in a college classroom and then left the class and returned 30 minutes later with a bump on her head that she did not remember receiving (Tr. 265).  Upon examination at the hospital, neurologic testing was normal, in that she was fully oriented, with normal sensation, reflexes, gait, and coordination (*id*.).  Blood tests were also normal, and a CT scan of the head was negative (Tr. 265, 267, 279).  The emergency room physician recommended that she stop taking the diet pills she had started recently and follow up with Dr. Healy for further testing, such as a repeat EEG (Tr. 266).

Later in October 2009, the plaintiff underwent four-hour EEG monitoring.  "Intermittent drowsiness" and "some sharp wave transients" were noted, but there was "no clear evidence of focal epileptiform activity" (Tr. 295).  Dr. Healy also made the notation: "clinical correlation necessary" (*id*.). Dr. Healy's notes indicate that he prescribed Keppra in November 2009 and requested a form from the Keppra Assistance Program (Tr. 311).  In December 2009, the plaintiff was reporting daily seizures despite taking Keppra, and Dr. Healy recommended increasing the dose (*id*.).  He also suggested further EEG monitoring, making the following notation: "? Pseudoseizures. Trying to get disability" (*id*.).  The plaintiff did not show up for a later appointment in December 2009.  In January 2010, Dr. Healy noted that the plaintiff had stated that she could not take Keppra but had not followed up; he also noted that she needed 24-hour EEG monitoring (Tr. 310).  In February 2010, he noted that the plaintiff had called to cancel her scheduled EEG monitoring because she had an ear infection and that she would call back when ready (*id*.); there is no indication that she ever rescheduled.

6

In June 2010, the plaintiff visited the emergency room reporting that she had a seizure after she stopped taking medication (Lamictal) two weeks earlier (Tr. 358-60). A CT scan of the brain was negative (Tr. 371), and an ECG was described as abnormal (Tr. 362), but the record does not contain any further description or analysis of the results. The plaintiff was discharged the same day with instructions to increase her fluid intake and follow up with Dr. Healy or another doctor (Tr. 363).

In July 2010, the plaintiff visited her family clinic, reporting that she had a seizure earlier that day and hit her head (Tr. 408).  The treating source noted that the plaintiff's "'seizures' have never been proved," that she had no response to Keppra, except that it made her feel suicidal, and that Lamictal had not stopped the seizures, but that she had never been prescribed a full dose.  No neurological or other abnormalities were noted, and she was given Dilantin (*id*.).  The dosage was increased in August 2010 (Tr. 406). Several weeks later, she reported that she had not yet received any benefit (Tr. 405), and in September 2010, the dose was again increased (Tr. 467).  In November 2010, the plaintiff's family practitioner recommended trying Lamictal again, noting that the plaintiff could not afford it before and prescribing a generic version (Tr. 468).  No abnormalities were noted upon examination (*id*.).

The most recent treatment note in the record, from May 2011, indicates that the plaintiff visited her family practitioner to complete disability forms.  The treating source noted that the plaintiff's "significant other," who was present, reported that the plaintiff was

7

having both tonic-clonic and complex partial seizures.[3]  No abnormalities were noted upon examination (Tr. 466).

### Consultative and Opinion Evidence

In November 2009, Dr. Healy submitted a statement that the plaintiff was currently unable to engage in any work activity due to a "seizure disorder," which he described as a "temporary and total" condition, and suggested that she would be able to work "once seizure controlled."  He also opined that the plaintiff could not drive or work around equipment or at heights (Tr. 296).

In April 2010, the plaintiff was examined by Mark Williams, Ph.D., a psychologist retained by the agency for a consultation. (Tr. 322-26).  The plaintiff reported a history of anxiety and depression, but stated that she had not received any psychiatric treatment since her early 20s (Tr. 322-23).  Dr. Williams described her as alert, attentive, fully oriented, and cooperative but guarded, with normal conversational skills, appropriate speech, dull affect, and behaviors revealing "some hesitation and dependent features" (Tr. 325).  He did not witness any involuntary movements, dystonias, other odd motor signs, psychomotor slowing or agitation. Dr. Williams conducted several cognitive tests, observing that her scores suggested that she was not giving adequate effort, "possibly [in] an attempt to try to appear more impaired than she actually is" (*id*.).  He assessed her as having both a mood and an anxiety disorder, not otherwise specified, "with characteristics suggesting immature psychological coping difficulties in her personality and overall adjustment" (Tr. 326).  Dr. Williams opined that the plaintiff would be able to work in a simple job, with no

---

[3] Generalized tonic-clonic (or "grand mal") seizures are caused by abnormal brain activity and involve the whole body; they can include rigid muscles, violent muscle contractions, and loss of alertness or consciousness. *See* Medline Plus, "Generalized Tonic-Clonic Seizure," at http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm (last updated May 16, 2014).  Partial seizures also involve abnormal brain activity, but in a limited area, and can range from simple to complex; complex partial seizures can affect memory or consciousness. *See id.*, "Partial (Focal) Seizure," at http://www.nlm.nih.gov/medlineplus/ency/article/000697.htm (last updated May 16, 2014).

difficulties understanding and recalling information, and that she would be able to sustain "adequate" concentration, persistence, and pace in a simple job despite motivation deficiencies.  He further opined that socially, she would do best interacting with individuals "in a routine and casual environment without having to interact with the public on a frequent basis," and that she could accept "non-threatening" supervision (*id.*).  He assessed a Global Assessment of Functioning ("GAF") score of 50[4] (*id.*).

Later in April 2010, state agency psychologist Janet Boland, Ph.D., opined that the plaintiff had a severe affective disorder, anxiety disorder, and personality disorder, which imposed mild limitations in her activities of daily living and moderate limitations in her social functioning and concentration, persistence, and pace (Tr. 328-40).  She further opined that the plaintiff should be able to: attend to and perform simple tasks without special supervision; attend work regularly, but might miss an "occasional" day; relate appropriately to supervisors and coworkers, but might be better suited to a job that did not require regular work with the general public; make simple work-related decisions and occupational adjustments; adhere to basic standards for hygiene and behavior; protect herself from normal workplace safety hazards; and use public transportation (Tr. 342-44).

The plaintiff attended a physical examination with consulting physician Harriet Steinert, M.D., in April 2010 (Tr. 345-47).  Dr. Steinert observed that the plaintiff was fully oriented, cooperative, and had no evidence of head trauma, and had normal visual fields and speech (Tr. 346-47).  She further observed that the plaintiff had full range of motion, normal motor skills, normal reflexes, and no sensory or motor deficits in any extremity, no muscle atrophy, and no spasticity, rigidity, involuntary movements, or tremors. (Tr. 347).

---

[4]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

She also noted that the plaintiff walked with a normal gait, could get up and down and dress herself unassisted, could tandem walk and walk on her toes and heels, could do rapid alternating hand movements, could do nose to finger pointing, and had a negative Romberg test.[5]  She noted that the plaintiff had "some type of seizures" (*id.*), per the plaintiff's description (Tr. 346), and listed her diagnosis as "seizures v. mental illness;depression" (Tr. 347).

In May 2010, state agency physician Rebecca Meriwether, M.D., reviewed the medical evidence of record and opined that the plaintiff had no exertional limitations, but should never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards (Tr. 351-57).  In October 2010, state agency physician Samuel Chastain, M.D., reviewed an updated record and concurred with this assessment, defining "hazards" to include unprotected heights, dangerous machinery, and operating vehicles. (Tr. 427-34).

In August 2010, James Garner, M.D., one of the plaintiff's family doctors, filled out a form indicating that she had "possible epilepsy," was taking Dilantin, and had "obvious" (but unspecified) work related functional limitations. (Tr. 403).  He further noted that she had never completed a neurologic evaluation for financial reasons, but that her doctors were trying to control her symptoms with anti-epileptic medication and that there had been no response yet (*id.*).

In November 2010. the plaintiff was examined by another consulting psychologist, Katherine Kelly, Ph.D. (Tr. 436-39).  Dr. Kelly observed that the plaintiff was appropriately dressed and groomed and oriented in all spheres, with depressed and mildly anxious mood and blunted to flat affect, had normal speech, made poor eye contact, and frequently looked around the room, but easily established rapport (Tr. 438).  Her memory

---

[5]  A Romberg test, which involves the subject standing and attempting to maintain balance with her eyes closed, tests the subject's equilibrium. *See* Physiopedia, "Romberg Test," at http://www.physio-pedia.com/Romberg_Test.

appeared to be within normal limits, except for dates and times; she was able to recall three words immediately, and one out of three after five minutes with a cue, and to readily complete a serial seven subtraction test and write a novel sentence (*id.*).  Dr. Kelly stated that the plaintiff might have some short-term memory issues based on the word-recall test, but that further testing would be necessary (Tr. 439).  She also observed that the plaintiff could complete activities of daily living independently and was capable of personal safety, but that she had not been participating in activities regularly and that her social functioning was restricted.  Dr. Kelly also noted that the plaintiff's language was within normal limits and that her stream of thought was appropriate and goal-oriented (*id.*).

Later in November 2010, state agency psychologist Jeanne Wright, Ph.D., reviewed the updated record and concurred with Dr. Boland's earlier assessment of the plaintiff's mental functioning. (Tr. 440-56).

In May 2011, treating physician Dr. Garner filled out a questionnaire stating that the plaintiff had 20 to 30 seizures per week; did not always have warning; was confused, exhausted, and irritable for anywhere from five to 30 minutes afterward; and had not responded to medication (Tr. 461-62).  He further opined that she was likely to disrupt the work of co-workers with her seizures; would need more supervision than other workers; could not work at heights, work with power machines, or operate a motor vehicle; could not take a bus alone; had associated depression, irritability, social isolation, poor self-esteem, short attention span, memory problems, and behavior problems; would need to take one to three unscheduled breaks during the day; and would likely miss more than four days of work per month (Tr. 463-64).

### Administrative Hearing Testimony

On August 4, 2011, the plaintiff appeared with counsel and testified in support of her applications (Tr. 28-68).  She testified that she did not leave the house much and that she had not driven since the summer of 2009 on her doctor's advice (Tr. 34-35).  She stated

11

that when she was taking a course in human services at Florence-Darlington Technical College, her teachers had noticed her having seizures and had advised her to complete her courses online from home (Tr. 36, 49). The plaintiff also stated that she was currently taking online classes at Anderson College and was scheduled to get a bachelor's degree in about a year and a half (Tr. 37). She stated that she got good grades, but that she was permitted extensions and additional testing time (*id.*). She testified that she last worked in August 2009 and attempted to work as a caretaker for an elderly woman after that, but never started the job after she had a seizure at the interview (Tr. 40-41). She explained that she currently spent most of her day working on her classes on her laptop, but that she did her work in bed and often did not stay on task (Tr. 47-48).

The plaintiff further testified that she first noticed symptoms in 2007, explaining that her eyes got blurry, she became confused, and she was unable to get her words out. She stated that she did not start experiencing regular symptoms until later, but that she started "losing time" when watching TV or during other activities, and that her symptoms had been continuously getting worse. She said that she had tried various medications and was taking them regularly, but also ran out of them sometimes because she could not always afford them (Tr. 50-52). The plaintiff again stated that she spent most of her day – 22 hours – in bed (Tr. 61), but that she got up to feed her seven animals (dogs, cats, and horses) twice a day, and tried to study (Tr. 53-54). She stated that she had seizures every day, could not always predict when they would occur, and would sometimes only learn afterward that she had had one (Tr. 55). The plaintiff stated that her most recent seizure had been at 4:30 that morning. She also stated that her medications did not work and only made her "crazy," except that her current medication, Lamictal, was "not as bad." She stated that she did not do any chores around the house, except for washing clothes when she needed to, and that she tried to avoid people because they had "started talking and said [she] was a drug addict]" when they saw her having seizures (Tr. 56, 59-60). She estimated that she

12

could walk a block, but only if she had someone with her, and stated that most days she did not get up or bathe and did not brush her teeth until her boyfriend came home (Tr. 60-61). She admitted that she had bathed before coming to the hearing, however, as well as three or four days earlier, stating that she was "not nasty . . . typically" (Tr. 62). The plaintiff stated that she was not currently receiving mental health treatment, but that she had made some attempt and had problems scheduling an appointment (Tr. 66-67).

The plaintiff's boyfriend testified that he had lived with the plaintiff or five or six years (Tr. 70). He stated that her first noticed the plaintiff having seizures in 2007 or 2008 and that there were "different versions and different levels of seizures," some where the plaintiff was simply "really easy to agitate" or "fuzzy-headed" and others involving "full fledged falling on the floor, shaking." (Tr. 71-72). He said that she would fall without warning and sometimes got bumps or bruises, but no injuries requiring a trip to the emergency room. He stated that she had had seizures in stores, restaurants, and in their truck, but that they did not go anywhere often anymore (Tr. 73). He said that she spent most of her time in bed (Tr. 74), that he did most of the chores around the house, except that the plaintiff took care of the horses, and that her condition had been getting worse (Tr. 75, 78). He stated that the plaintiff had had seizures in her doctor's office and had been fuzzy-headed at the emergency room (Tr. 77). He stated that when she was working on her computer, she would stop for a period unexpectedly, then start typing again after five or 30 minutes as if nothing had happened (Tr. 78).

### Vocational Expert Testimony

A vocational expert testified at the hearing that a hypothetical individual could not perform any of the plaintiff's prior jobs if she had no exertional limitations but could not climb ladders, ropes, or scaffolds; could not be around unprotected heights or dangerous machinery with exposed moving parts; could not operate automotive equipment; and was limited to unskilled work with no more than occasional required direct communication with

13

the public (Tr. 83-84). She testified that this hypothetical individual could, however, work as a hand packer, kitchen helper, or food service worker, and that all these jobs would remain available to an individual who should not be expected to meet strict production quotas (Tr. 84-85). The vocational expert testified that no jobs would be available, however, if the individual had to take three unscheduled breaks and rest for one to three hours out of an eight-hour workday (Tr. 85-86). She stated that missing four days of work per month would also preclude all work, as would being unable to focus and concentrate for at least two hours out of an eight-hour day (Tr. 89-90).

Dixon Pearsall, a vocational consultant who submitted an assessment in support of the plaintiff's application (Tr. 238-45), also testified. He stated that, in his opinion, the plaintiff would not be able to work as a hand packer or kitchen worker if she had all the limitations described by Dr. Garner, especially the requirement to rest for one to three hours per day (Tr. 94). He stated that missing four days of work per month would also preclude all work (Tr. 95)

## ANALYSIS

The plaintiff was born on January 3, 1977, and she was 32 years old on her alleged disability onset date (August 30, 2009). She was 34 years old on the date the ALJ issued her decision. She received a GED in 2007 and completed an associate's degree in human services at Florence-Darlington Technical College in December 2009 (Tr. 35-36, 246, 437). At the time of hearing, she was pursuing a bachelor's degree online in human services at Anderson University (Tr. 37). She had experience working as a van driver, animal shelter supervisor, sales clerk, cocktail waitress, group worker, and dancer (Tr. 82-83). The plaintiff makes numerous allegations of error at several steps of the sequential evaluation process. Accordingly, the ALJ's decision and those allegations of error will be discussed sequentially below.

14

### Step Two

At step two, the ALJ found that the plaintiff had three severe impairments: "seizure disorder or pseudo-seizure disorder," depression, and anxiety (Tr. 11). The plaintiff first takes issue with the ALJ's observation that she cancelled the 24-hour EEG monitoring scheduled by Dr. Healy and never rescheduled (Tr. 11), stating that Dr. Healy had "demanded $250 on past debt as well as $250 towards the scheduled appointment prior to seeing [her]," that she does not have health insurance, and that she could not afford to pay the hospital to perform the EEG monitoring (pl. brief at p. 1).

As the Fourth Circuit stated in *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir.1984), "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." It is well settled that a claimant for Social Security benefits should not be "penalized for failing to seek treatment [he] cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). Social Security Ruling ("SSR") 96-7P expressly addresses the situation where a claimant asserts that she has not pursued medical treatment because of a lack of financial resources. *See* SSR 96-7P, 1996 WL 374186. In such a situation, the fact finder is admonished from drawing "any inferences about an individual's symptoms and their functional effects" from a failure to pursue medical treatment "without first considering any explanations that the individual may provide . . . ." *Id*. at *7. However, here, assuming the plaintiff's allegations are true[6], the ALJ was not faulting the plaintiff or drawing adverse inferences about the severity of her symptoms from her failure to seek treatment, but rather, was merely pointing out that, absent testing, no diagnosis or cause for the plaintiff's alleged symptoms could be established (Tr. 11-12). *See* 20 C.F.R. §§ 404.1508, 416.908 ("A physical or mental impairment must be established by medical evidence consisting of signs,

---

[6] Dr. Healy's treatment notes state that the plaintiff called to cancel her scheduled 24-hour EEG monitoring because she had an ear infection and that she would call back when ready (Tr. 310).

symptoms, and laboratory findings, not only by your statement of symptoms."). This observation was appropriate, particularly considering that the plaintiff had the burden to establish both the existence and severity of her impairments. 20 C.F.R. §§ 404.1512(c), 416.912(c) ("You must provide medical evidence showing that you have a severe impairment(s) and how severe it is during the time you say that you are disabled.").

The plaintiff also states that one notation on the four-hour EEG report – "clinical correlation necessary" – is evidence of "some form of abnormality rather than a normality" (pl. brief at p. 1). The ALJ accurately summarized all the EEG findings (Tr. 11; *see* Tr. 295 ("intermittent drowsiness and sharp wave transients with no clear evidence of focal epileptiform activity")), and absent any further analysis of the report by any medical source, it was reasonable for the ALJ not to draw any particular inferences. There is no evidence that any medical professional ever stated that the EEG report lent support to any particular diagnosis or alleged symptoms.

The plaintiff also takes issue with the ALJ's evaluation of Dr. Garner's August 2010 opinion (pl. brief at p. 2). The physician indicated that the plaintiff had "obvious" mental limitations due to "possible epilepsy" and had not yet responded to medication (Tr. 403). The ALJ gave this opinion little weight because Dr. Garner "gave mental limitations, but did not identify a mental diagnosis" (Tr. 12). This observation is accurate; Dr. Garner did not identify or describe the allegedly "obvious" limitations nor did he describe the plaintiff's mental status on the form (Tr. 403). Under these circumstances, the ALJ reasonably discounted this opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents evidence to support an opinion, . . . . [and] [t]he better an explanation a source provides, the more weight we will give that opinion.").

The plaintiff also faults the ALJ for discounting the assessment of Dr. Williams, one of the consulting psychologists (pl. brief at p. 2); however, she fails to demonstrate that his assessment compels a finding of greater limitations. Despite giving the assessment

16

limited weight, the ALJ accepted some of Dr. Williams' conclusions at step two, including his diagnoses of mood disorder and anxiety disorder (Tr. 11-12; *see* Tr. 322-26). The ALJ also accepted Dr. Williams' opinion that the plaintiff could work a simple job; would not have any difficulties understanding and recalling information; could carry out simple work with adequate concentration, persistence, and pace; could interact best with individuals in a routine and casual environment without having to interact with the public on a frequent basis; and could handle non-threatening supervision (Tr. 12; *see* Tr. 326). The ALJ included similar social limitations in the residual functional capacity ("RFC") assessment (Tr. 15) and ultimately found that the plaintiff could perform several unskilled jobs (Tr. 19), consistent with a limitation to simple work. *See* SSR 85-15, 1985 WL 56857, at *4 (1985). The ALJ discounted Dr. Williams' GAF score of 50, however, because he had examined the plaintiff only once, the score was "inconsistent with the substantial weight of the evidence," and there was no way to determine whether this score was based on the plaintiff's functioning or her allegations. (Tr. 12-13). While the plaintiff correctly points out that a GAF score of 50 is within the range suggesting serious symptoms (albeit on the upper end) (pl. brief at p. 2), the ALJ was not required to accept that assessment and reasonably discounted it. *See Hunter v. Colvin*, No. 1:10-cv-401, 2013 WL 2122575, at *7 (M.D.N.C. May 15, 2013) (finding it was not prejudicial error for the ALJ to disregard GAF scores as conclusory where there was no meaningful discussion in the treatment notes of the basis for the GAF scores or how they limited the claimant's ability to function) (citations omitted)*; Green v. Astrue*, No. 1:10-cv-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) ("A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time a GAF score is given. Without additional context, a GAF score is not meaningful.") (citation omitted).

The plaintiff also disagrees with the ALJ's finding that Dr. Williams' assessment was inconsistent with the evidence of record, noting that another consultative

psychologist, Dr. Kelly, diagnosed her with "Major Depressive Disorder, moderate, Panic Disorder, with Agoraphobia (mild), Rule out Bipolar Disorder, Type II" (pl. brief at p. 2 (citing Tr. 438). While Dr. Kelly's diagnoses were largely consistent with Dr. Williams' diagnoses (Tr. 326, 438), they were also largely consistent with the ALJ's findings (Tr. 11).The plaintiff has not explained or demonstrated how Dr. Kelly's findings tend to lend more support to Dr. Williams's GAF score. At most, she disputes the ALJ's finding that her memory was "within normal limits" (pl. brief at p. 2 (citing Tr. 13)). Dr. Kelly observed that the plaintiff's memory appeared to be within normal limits, except for dates and times; she was able to recall three words immediately, and one out of three after five minutes with a cue, and to readily complete a serial seven subtraction test and write a novel sentence (Tr. 438). Dr. Kelly stated that the plaintiff might have some short-term memory issues based on the word-recall test, but that further testing would be necessary (Tr. 439). State agency psychologist Dr. Wright took these test results into account before concluding that the plaintiff had only moderate concentration limitations (Tr. 450-52), and the ALJ gave Dr. Wright's opinion "significant weight" in making the RFC finding (Tr. 17). Based upon the foregoing, the ALJ was not required to find greater limitations.

Despite the lack of medical evidence, the ALJ found that the plaintiff's seizure or pseudo-seizure disorder was a severe impairment (along with anxiety and depression) and continued with the sequential evaluation process. If an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence").

Based upon the foregoing, substantial evidence supports the ALJ's step two finding, and the allegations of error are, at most, harmless.

**Step Three**

At step three of the sequential evaluation process, the ALJ found that he plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments (Tr. 13-14). To meet the listing for depression (Listing 12.04) or anxiety (Listing 12.06), the claimant must demonstrate either (A) certain enumerated symptoms specific to each impairment (the "A criteria") and (B) a certain degree of functional limitation (the "B criteria"), or (C) even more extreme evidence of an inability to function. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(A). Here, both the ALJ's analysis and the plaintiff's arguments focus on whether the plaintiff met the B criteria (Tr. 13-14; pl. brief at pp. 2-3), which require her to demonstrate two of the following: marked restrictions in two areas of functioning (activities of daily living, social functioning, and concentration, persistence, and pace), or marked restrictions in one of these areas, plus evidence of extended episodes of decompensation. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04, 12.06.

The ALJ first reasonably determined that the plaintiff had no more than moderate restriction in her activities of daily living (Tr. 13). The ALJ noted the plaintiff's statements to Dr. Williams that she was independent in her self-care, but did not bathe daily, and rarely cleaned the house or shopped for groceries (Tr. 13; *see* Tr. 324-25) and contrasted them with her statements to Dr. Kelly that she had no problems with self-grooming, preparing meals, cleaning, washing dishes, sweeping, laundry, and grocery shopping (Tr. 14; *see* Tr. 436). The plaintiff disputes the ALJ's observation, later in the decision, that these statements were not entirely consistent (Tr. 16), pointing out that she told Dr. Kelly that she rarely engaged in housekeeping activities (pl. brief at pp. 4-5 ; *see* Tr.

19

436).  However, the plaintiff does not deny her statement that she was able to perform these activities even if she did not, in fact, perform them on a regular basis.

The ALJ also reasonably found no more than moderate difficulties in social functioning (Tr. 14).  The plaintiff disagrees, asserting that she "avoid[s] others like the plague" and has little interaction with others except for brief online interaction (pl. brief at p. 3).  However, the ALJ took into account her statements that she "experienced social isolation" and spent most of her time at home unless she went to a grocery store (Tr. 14; *see* Tr. 301, 436). Dr. Boland and Dr. Wright also considered these statements and found that they suggested moderate limitations (Tr. 338-40, 450-52).   The ALJ gave "significant weight" to these opinions (Tr. 17).  As the ALJ also considered that the only evidence of limitations was the plaintiff's own statements – significantly, there was no indication that the plaintiff ever sought mental health treatment, and therefore there were no treatment notes corroborating her allegations (Tr. 17) – the ALJ reasonably declined to find greater limitations.

Finally, the ALJ found that the plaintiff had moderate restrictions in concentration, persistence, or pace (Tr. 14). The plaintiff disagrees, pointing to Dr. Kelly's observation that she "tend[ed] to look off or be annoyed with the ticking clock," a statement from Anderson University that the plaintiff received academic adjustments under the Americans with Disabilities Act, and a statement from Winfield Brown, Human Services Field Placement Supervisor at Florence-Darlington Technical College, who stated that he had witnessed a number of the plaintiff's seizures (pl. brief at p. 3; *see* Tr. 235, 246).  The only evidence from medical sources addressing concentration issues was Dr. Williams' assessment that the plaintiff could carry out simple work with adequate concentration, persistence, and pace (Tr. 12; *see* Tr. 326), and Dr. Kelly's observations regarding memory, which were addressed above (Tr. 13; *see* Tr. 438-39)  It was therefore appropriate for the

ALJ to defer to Dr. Boland's and Dr. Wright's assessments of moderate limitations (Tr. 338-40, 450-52).

Based upon the foregoing, the record supports the ALJ's determination that the plaintiff did not have marked limitations in any area of functioning and, accordingly, did not meet or equal the listings for anxiety or depression.

The ALJ also correctly determined that the plaintiff's seizures did not meet or equal either listing related to epilepsy, 11.02 (Convulsive Epilepsy) or 11.03 (Nonconvulsive Epilepsy) (Tr. 14). As the ALJ noted, no medical source of record ever formally diagnosed the plaintiff with epilepsy or otherwise identified the cause of her alleged seizures, or even confirmed their occurrence objectively (*id.*). This ambiguity weighs heavily against a finding of automatic disability under the listings. *See MacNeil v. Astrue*, 908 F. Supp. 2d 259, 266 (D. Mass. 2012) (noting that determinations at step three are established primarily by objective medical evidence, not by subjective complaints). Furthermore, as argued by the Commissioner, the ALJ's observations were accurate. While the plaintiff again disputes the ALJ's characterization of the November 2009 EEG as "essentially negative" (pl. brief at p. 3; *see* Tr. 14), this characterization was valid for the reasons discussed above.

The ALJ further observed that "[n]o inpatient care or evaluation has been suggested and no treating, examining, or emergency room physician has described witnessing a seizure" (Tr. 14). The plaintiff disputes the second part of this sentence, pointing to her June 2010 emergency room records (pl. brief at p. 3; *see* Tr. 360). However, these records do not state that the emergency room treating sources witnessed a seizure, as the plaintiff asserts; rather, the individual who filled out the form checked a box indicating that the seizure was witnessed (Tr. 360). As the name of the individual listed as witnessing or describing the seizure is illegible, it is not clear that it was a member of the emergency room staff. Moreover, the same form includes the entry "PTA" for time of onset of the seizure (*id.*), which, as argued by the Commissioner, in this context likely indicates "prior to

21

admission" or "prior to arrival." *See* http://acronyms.thefreedictionary.com/PTA. The intake form, prepared the same day, describes the onset as 20 minutes prior to arrival (Tr. 358), and a nurse's note, written the same day, describes the incident as a "seizure?" (Tr. 359). In light of these notations in the emergency room records, the plaintiff has not demonstrated any error in the ALJ's finding that no medical professional witnessed a seizure.

Based upon the foregoing, substantial evidence supports the ALJ's step three finding, and the allegations of error are without merit.

### Residual Functional Capacity

The ALJ found that the plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: no climbing ladders, ropes, or scaffolds; no work around unprotected heights or dangerous machining with exposed moving parts; no operating automotive equipment; and no more than occasional direct contact with the public and no work requiring strict production quotas (Tr. 14-18).

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that

22

it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with

23

objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity,

persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 16).   The ALJ found that the plaintiff had made inconsistent statements that impeached her credibility.  The ALJ noted (Tr. 16) that while the plaintiff told Dr. Williams that she did not bathe daily and rarely cleaned the house, shopped for groceries, or participated in any hobbies or leisure activities (Tr. 324), she told Dr. Kelly that she had no problem independently self grooming, preparing meals, cleaning, washing dishes, sweeping, laundry, and grocery shopping (Tr. 436). The plaintiff argues that these statements are not inconsistent because she also told Dr. Kelly that she engaged in these activities "rarely" (pl. brief at pp. 4-5; *see* Tr. 436). However, as noted above, the plaintiff does not deny her statement that she was able to perform these activities even if she did not, in fact, perform them on a regular basis. The plaintiff also points out that she told Dr. Kelly that she "used to enjoy" activities such as shopping at the mall, flying model airplanes, and driving (Tr. 436), but the ALJ misunderstood that she described these activities in the past tense and found these hobbies to be inconsistent with her claims of disabling symptoms (pl. brief at pp. 4-5; *see* Tr. 16).  Clearly the ALJ failed to understand that the plaintiff said she "used to enjoy" these hobbies; however, the undersigned finds that the error was harmless as the ALJ gave other valid reasons for the credibility finding. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The ALJ also found implausible the plaintiff's testimony that she remained in bed 22 hours a day, particularly when she also testified that she fed all her animals twice a day and took online classes (Tr. 16).  The plaintiff reasserts that she does, in fact, spend 22 hours a day in bed, if not more, and that she does all her course work on her laptop in bed (pl. brief at p. 5).  Based upon the evidence of record, the undersigned cannot say that the ALJ's finding that the plaintiff claim that she spent 22 hours a day in bed was implausible given that the plaintiff was able to obtain an associate's degree after her alleged onset date

(*see* Tr. 437).  This court must show deference to the ALJ's credibility determinations unless they are "unreasonable, contradict[ ] other findings of fact, or [are] based on inadequate reason or no reason at all." *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir.1997) (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir.1993)).  Moreover, as argued  by the Commissioner, even accepting the plaintiff's allegations regarding her activities as true, the ALJ reasonably found that they did not compel a finding of limitations beyond those included in the RFC assessment, particularly in the absence of corroborating objective evidence (Tr. 17).

The ALJ also considered statements from other parties. The ALJ afforded little weight to the plaintiff's boyfriend's testimony in light of their relationship and also because of inconsistencies between his descriptions of the plaintiff's daily activities and her own descriptions to Dr. Kelly (Tr. 15-16).  The plaintiff argues that this testimony warranted more weight, stating: "Who better to testify about my daily activities than someone [I] live with?" (pl. brief at pp. 3-4).  The ALJ also considered a written statement submitted by the plaintiff's professor from Florence-Darlington Technical College (Tr. 16).  Winfield Brown stated that he had personally witnessed the plaintiff's seizures at school, and the plaintiff would lose muscle control and have mild twitching as well as become unresponsive for awhile.  He further stated that although the plaintiff started out attending classes on campus, she was advised to continue her education online as she began to have increased seizure activity at school, and the department felt her safety would be endangered if she continued to come to class (Tr. 246).  The ALJ acknowledged Mr. Brown's statement and found that it was entitled to little weight as the plaintiff earlier reported that no one had really been aware that she was having seizures and because Mr. Brown never called for medical assistance for the plaintiff, which would be expected for someone experiencing seizure activity (Tr. 16).  The plaintiff claims that she was not aware that she was having the seizures until Mr. Brown brought them to her attention and that she told Mr. Brown not to

call for medical assistance because she could not pay for it (pl. brief at p. 4).   She acknowledges that Mr. Brown would have called for assistance if he had felt she was in danger (*id.*).

The ALJ is not required to give non-medical sources significant weight in her assessment. Rather, an ALJ "may" use evidence from other non-medical sources, such as testimony from spouses, parents, and friends, to show the severity of one's impairment(s) and how it affects their ability to work. *See* 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Although "information from [non-medical sources] ... may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function," these non-medical sources should be considered in light of "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–03p, 2006 WL 2329939, at *5-6.   As argued by the Commissioner, even accepting all this testimony as true, it was still within the ALJ's discretion as fact-finder to afford the testimony little weight due to the absence of corroborating medical evidence.   "Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony." *Plowden v. Colvin*, No. 1:12-cv-2588-DCN, 2014 WL 37217, at *18 (D.S.C. Jan. 6, 2014) (citing *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir.1995); *Carlson v. Shalala*, 999 F.2d 180 (7th Cir.1993); *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir.1992); *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir.1984)). *See Prater v. Harris*, 620 F.2d 1074, 1085-86 (4th Cir.1980) ( "Other than the lay testimony, the other evidence adduced was inadequate to prove, by a preponderance of the evidence, that the claimant was disabled. . . ."). Because the ALJ cited to substantial evidence, including objective clinical findings, in discounting the plaintiff's subjective complaints and those

27

complaints were similar to the limitations outlined by her boyfriend and professor, the undersigned recommends a finding that the ALJ did not err in his credibility determination.

The ALJ found that the RFC assessment accommodated the limitations caused by the plaintiff's seizures, depression, and anxiety (Tr. 17). Substantial evidence supports this finding. The ALJ cited consultative examiner Dr. Steinert's results and impressions (Tr. 17; *see* Tr. 346-47). Dr. Steinert was aware that the plaintiff was allegedly experiencing seizures, but all neurological testing was normal, and her final impression was "seizures v. mental illness" (Tr. 347). The ALJ therefore inferred that Dr. Steinert found the plaintiff's allegations, by themselves, insufficient to conclude whether she was having seizures (Tr. 17). The plaintiff argues that the ALJ should not have relied on Dr. Steinert's evaluation to any extent because the various tests Dr. Steinert administered "had nothing to do with seizures," and the "only way [she] could have failed the test at that time was to have been having a seizure at the time the test was being performed" (pl. brief at p. 5). The undersigned finds that it was reasonable for the ALJ to find that Dr. Steinert's inconclusive examination results did little to help the plaintiff meet her burden of proof.

The ALJ also placed significant weight on the opinions of the state agency physicians and psychologists in assessing the plaintiff's RFC (Tr. 17). As noted by the Commissioner, the plaintiff misunderstands the ALJ's analysis of the state agency psychologists' opinions, as she disputes the ALJ's purported assignment of little weight to the opinions (pl. brief at p. 5). In fact, the ALJ adopted most of the opinions and assigned little weight only to portions identifying only mild limitations in activities of daily living; the ALJ found that greater limitations in this area were warranted (Tr. 17; *see* Tr. 338, 450). Accordingly, the ALJ's disagreement with these opinions was to the plaintiff's advantage.

The plaintiff also disagrees with the ALJ's assignment of significant weight to Dr. Meriwether's and Dr. Chastain's opinions that she had no physical exertional limitations, stating, "I have never seen nor spoken to the individuals who evaluated me thus how can

28

they give a conclusion at all about my limitations?" (pl. brief at p. 6). Dr. Meriwether and Dr. Chastain both indicated, however, that they based their opinions on review of the plaintiff's medical records (Tr. 351-56, 428-34), and it is well established that an ALJ must take state agency physicians' opinions into account as opinion evidence in evaluating RFC. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (opinions of non-examining state agency medical sources must be considered by the ALJ as those of highly-qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Social Security Act); SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that a non-examining physician's opinion can be relied upon when it is consistent with the record and that, "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand").  The plaintiff has not identified any particular reason to question the ALJ's reliance on Dr. Meriwether's or Dr. Chastain's opinions, and she does not allege, much less demonstrate, any exertional limitations nor any postural or environmental limitations beyond those already included in the ALJ's RFC assessment.

The plaintiff also challenges the ALJ's assignment of little weight to Dr. Pearsall's testimony and opinion that she could not perform any full-time competitive employment (pl. brief at p. 6; *see* Tr. 94-95, 238-45). The ALJ discounted the opinion because Dr. Pearsall examined the plaintiff only once, his opinion was not supported by the substantial weight of the evidence, and because it concerned the plaintiff's credibility, an issue reserved to the Commissioner (Tr. 18).  As noted by the Commissioner, Dr. Pearsall's testimony and report both appear to be based on the assumption that all the plaintiff's

allegations regarding her seizures and limitations were credible, contrary to the ALJ's conclusion.  Accordingly, the ALJ reasonably gave the testimony little weight (Tr. 18).

The ALJ gave little weight to the opinion of treating physician Dr. Garner, who opined that the plaintiff had 20 to 30 seizures per week; did not always have warning; was confused, exhausted, and irritable for anywhere from five to 30 minutes afterward; and had not responded to medication (Tr. 461-62).  He further opined that she was likely to disrupt the work of co-workers with her seizures; would need more supervision than other workers; could not work at heights, work with power machines, or operate a motor vehicle; could not take a bus alone; had associated depression, irritability, social isolation, poor self-esteem, short attention span, memory problems, and behavior problems; would need to take one to three unscheduled breaks during the day; and would likely miss more than four days of work per month (Tr. 463-64).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.   These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

30

inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4ᵗʰ Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As the ALJ pointed out, this opinion, as well as Dr. Garner's description of the plaintiff's seizures (Tr. 461), appears to have been based entirely on the plaintiff's allegations, rather than on any objective observations or diagnostic testing (Tr. 17).

Based upon the foregoing, the undersigned finds that the RFC assessment is based upon substantial evidence, and the plaintiff's allegations of error are without merit.

### Steps Four and Five

At step four, the ALJ determined that the plaintiff could not perform any past relevant work (Tr. 18), and the plaintiff takes no issue with this finding. At step five, the ALJ determined that the plaintiff was not disabled because there were jobs existing in significant numbers in the national economy that she could perform. (Tr. 18-19). The plaintiff states that she does "not understand" portions of the ALJ's step-five analysis and seeks explanations (pl. brief at pp. 6-7).

At step five, the ALJ determines whether a claimant who cannot perform past relevant work can adjust to any other jobs existing in significant numbers in the national

economy, taking into account her RFC and vocational profile, i.e., her age, education, and work experience. 20 C.F.R. §§ 404.1560(c), 416.960(c).  As argued by the Commissioner, the plaintiff's assertion that the ALJ held her education and work experience against her (pl. brief at p. 7) reflects a misunderstanding of the step-five analytical framework, which mandates consideration of these factors.  *See* 20 C.F.R. §§ 404.1560(c), 404.1564 (explaining how education is used as vocational factor), 404.1565 (explaining how work experience is used as a vocational factor), 416.960, 416.964, 416.965.  The plaintiff states that she does not understand the ALJ's Finding 9 that transferability of job skills was not material to the determination of whether or not the plaintiff was disabled (pl. brief at pp. 6-7; *see* Tr. 18).  The question of whether a claimant has transferrable skills may become a more critical question as the claimant's age and exertional limitations increase, *see* 20 C.F.R. §§ 404.1568(d), 416.968(d), but it was not outcome-determinative here, which is all the ALJ meant in Finding 9 (Tr. 18).

The ALJ first considered whether it was possible to determine if the plaintiff was disabled based solely on the Medical-Vocational Guidelines (the "Grids"), found at 20 C.F.R. pt. 404, subpt. P, app. 2, but determined that reliance on the Grids was not possible because the plaintiff had a number of nonexertional limitations (Tr. 18-19).  *See Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984) (if claimant's non-exertional limitations have a significant impact on her ability to perform work at a given exertional level, then relying on the Grids is inappropriate and further vocational evidence is necessary).  Accordingly, the ALJ based her step five finding on the vocational expert's testimony. (Tr. 19).

The ALJ found that the plaintiff was not disabled because the vocational expert identified three jobs that she could perform if she had all the limitations the ALJ ultimately included in the RFC (Tr. 14-15, 19; *see* Tr. 83-85). The plaintiff argues that this finding was erroneous because the vocational expert testified that she could not perform any of these jobs if she had to rest for up to three hours out of an eight-hour workday in the

event of a seizure (pl. brief at p. 7; *see* Tr. 85-86).  However, the ALJ ultimately found that the plaintiff was not so limited and assessed an RFC consistent with the first hypothetical (Tr. 14-19). Because substantial evidence supports this RFC assessment as discussed above, the vocational expert's testimony identifying jobs consistent with this RFC was sufficient to meet the Commissioner's burden at step five.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 7, 2014
Greenville, South Carolina

33

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).